IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| SHARRIE B., | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-cv-00007 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:  Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Sharrie B. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decisions denying Sharrie's claims for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the

applicable law, I cannot find that the Commissioner's denial of benefits is supported by

substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge

reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it

may not "reweigh conflicting evidence, make credibility determinations, or substitute [its]

judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).

Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the

Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial

evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir.

1

2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1383c(a)(3)(B); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[1] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Sharrie filed for DIB and SSI in December 2019. *See* Administrative Record ("R.") 254–59, ECF No. 12. She alleged that she became disabled on March 4, 2018, because of knee and back problems. *See* R. 87, 99, 282. Sharrie was forty-seven years old, or a "younger person" under the regulations, on her alleged onset date. *See* R. 87, 99; 20 C.F.R. §§ 404.1563(c), 416.963(c). When Sharrie turned fifty in August 2020, she moved into the regulations' "closely approaching advanced age" category. *See* R. 129; 20 C.F.R. §§ 404.1563(d), 416.963(d).

Disability Determination Services ("DDS"), the state agency, denied Sharrie's claims initially in April 2020, R. 87–113, and upon reconsideration in September 2020, R. 114–45. On February 25, 2021, Sharrie appeared with counsel and testified by telephone at an administrative hearing before ALJ H. Munday. R. 51–74. A vocational expert ("VE") also testified. R. 75–80. During the hearing, ALJ Munday noted that Sharrie's earnings record "appear[ed]" to show "SGA earnings after the original [alleged onset] date," which could be "problematic," R. 56, considering Sharrie's allegations that severe back and lower-extremity pain prevented her from working during this same time.[2] *See generally* R. 56–66, 301–07. After the hearing, Sharrie submitted a letter changing her alleged disability onset date to February 18, 2021. R. 276.

---

[2] "SGA" is short for "substantial gainful activity." Substantial gainful activity is defined as "work activity" that "involves doing significant physical or mental activities . . . for pay or profit." *See* 20 C.F.R.

ALJ Munday issued an unfavorable decision on May 19, 2021. R. 11–25. At step one,

she found that Sharrie had "not engaged in substantial gainful activity since February 18, 2021,

the amended alleged onset date." R. 14. She did not make any specific factual findings about the

nature or extent of Sharrie's work activity in 2019–2020. R. 14, 22. At step two, ALJ Munday

found that Sharrie had the following "severe" medically determinable impairments ("MDI"):

obesity, with BMI scores over 44; bilateral knee osteoarthritis, status-post 2014 total right-knee

replacement and 2017 left-knee arthroscopy; right-ankle bursitis[3]; and lumbar degenerative disc

disease. R. 14; *see* R. 17, 19. Those severe MDIs did not meet or medically equal the relevant

Listings. R. 16–17 (citing 20 C.F.R. pt. 404, supt. P, app. 1 §§ 1.15 (skeletal spine disorders),

1.18 (abnormality of a major joint)); SSR 19-2, 2019 WL 2374244 (May 20, 2019 (obesity)).

ALJ Munday then evaluated Sharrie's residual functional capacity ("RFC") based on

aspects of the record created between August 2019 and February 2021. *See* R. 17–22. As most

relevant here, ALJ Munday found that Sharrie could perform "light work"[4] and "occasionally"

push/pull with her bilateral lower extremities. R. 17; *see* Pl.'s Br. 2, 4–5, ECF No. 14.

---

§§ 404.1572(a)–(b), 416.972(a)–(b). If a claimant "is working and the work [he or she] is doing is
substantial gainful activity, [the ALJ] will find [that the claimant is] not disabled," regardless of his or her
medical impairments and alleged functional limitations. *See id.* §§ 404.1520(b), 416.920(b). Even if the
claimant is not working, evidence that he or she used to do SGA-level work is relevant to the ALJ's
disability determination. *See id.* §§ 404.1571, 416.971. A claimant's earnings record is the "primary"
source of information used to determine if his or her work activity qualifies as SGA. *Id.* §§ 404.1574,
416.974.

[3] "Bursitis" is an inflammation of any bursae, which are small fluid-filled sacs typically found where
bones, tendons, and muscles rub against each other. *See Bursitis*, Dorland's Illustrated Medical Dictionary
264 (32ed. 2012). ALJ Munday also noted elsewhere in her decision that the objective medical evidence
showed both an "avulsion fracture" of Sharrie's right ankle, R. 19 (citing R. 1204); *see also* R. 20 (citing
R. 399), and right "foot osteoarthritis with old injuries," R. 21 (citing R. 125, 140). ALJ Munday did not
find either of those anatomical abnormalities to be a "medically determinable impairment" as defined by
the regulations. *See* R. 14, 16–17, 20; 20 C.F.R. §§ 404.1521, 416.921.

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). "The full range of light work
[further] requires the ability to stand or walk for up to six hours per workday or sit 'most of the time with
some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL

At step four, ALJ Munday found that Sharrie's RFC would have allowed her to return to her past

relevant work as a hotel maid, as that light unskilled job was actually or generally performed. R.

22–23 (citing R. 77–78). At step five, she found in the alternative that Sharrie's RFC—combined

with her high-school education, unskilled work history, and status as a person "closely

approaching advanced age"—would have allowed her to do other light, unskilled occupations

(school-bus monitor, office helper, storage facility rental clerk) existing in the national economy.

R. 23–24 (citing R. 77–78). Based on those findings, ALJ Munday concluded that Sharrie had

"not been under a disability" from February 18, 2021, through May 19, 2021. R. 24–25. The

Appeals Council declined to review that decision, R. 1–4, and this appeal followed.

### III. Discussion

Sharrie makes two unrelated arguments on appeal. Pl.'s Br. 2. First, she argues that ALJ

Munday's RFC assessment does not adequately explain why she rejected all "four medical

opinions most consistent with sedentary work,"[5] *id.* at 4 (citing R. 94–95, 383–96, 399–404,

406–10), and instead found that Sharrie could stand and/or walk often enough to do "light" work,

"which requires 'a good deal of standing or walking' and 'being on one's feet for up to two-

---

1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL
31251, at *5–6 (Jan. 1, 1983). The ALJ in this case appears to have adopted one DDS physician's medical
opinion that Sharrie could meet all of those physical demands, R. 21 (citing R. 123,138), but she did not
make any specific findings about Sharrie's remaining abilities to sit, stand, and/or walk during a normal
eight-hour workday, *see* R. 17–22. This was legal error. *See Dowling v. Comm'r of Soc. Sec. Admin.*, 986
F.3d 377, 388 (4th Cir. 2021) (applying SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)).

[5] "Sedentary" work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying
[objects] like docket files, ledgers, and small tools," 20 C.F.R. §§ 404.1567(a), 416.967(a), plus sitting for
about six hours and standing/walking for about two hours during an eight-hour workday, *Hancock v.
Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).
"The major difference between sedentary and light work is that most light jobs—particularly those at the
unskilled level of complexity—require a person to be standing or walking most of the workday." SSR 83-
14, 1983 WL 31254, at *4 (Jan. 1, 1983).

thirds of [an eight-hour] workday,'" *id.* at 5 (quoting SSR 83-10, 1983 WL 31251, at *5–6). She

argues that this error was not harmless because, given the ALJ's findings about her vocational

profile, the regulations would have entitled Sharrie to disability benefits had the ALJ found she

was limited to sedentary work. *See id.* at 3–4, 8–13 (citing R. 23–24; 20 C.F.R. pt. 404, subpt. P,

app. 2 § 201.14). Second, Sharrie argues that Nancy Berryhill, who was the Acting

Commissioner of Social Security when this ALJ issued her decision in May 2021, was appointed

in violation of the Appointments Clause, U.S. Const. Art. 2, § 2, cl. 2, and therefore did not have

authority to delegate power to the agency adjudicators who denied Sharrie's disability claims.

*See* Pl.'s Br. 13–15.

Sharrie's first argument is persuasive. ALJ Munday did not adhere to the regulations'

"articulation requirements" when evaluating most of the medical opinions in Sharrie's record, 20

C.F.R. §§ 404.1520c(b), 416.920c(b), and her explanation why she found each opinion "to be

persuasive, generally" or "not persuasive," R. 20–21, conflicts with her own RFC findings,

cherry-picks material to support her conclusions, and overlooks objective medical evidence that

tends to support the four medical opinions indicating that Sharrie could not stand/walk enough to

do light work.[6] *See Oakes v. Kijikazi*, 70 F.4th 207, 212–15 (4th Cir. 2023); *Thomas v. Berryhill*,

---

[6] The Commissioner's brief does not directly address these errors. *See* Def.'s Br. 5–8. Instead, she points
out that *all* of these opinions were rendered prior to [Sharrie's] amended alleged onset date (February 18,
2021)," and asserts that the more restrictive medical "opinions are refuted by [Sharrie] herself because she
testified that she was working 39 hours a week at the substantial gainful activity level as a hotel maid
(which is light in exertion) up until at least February 18, 2021." *Id.* at 8 (citing R. 63, 76–77). "[T]he
ALJ's written decision contains none of those justifications," *Bates v. Berryhill*, 726 F. App'x 959, 960
(4th Cir. 2018); *see* R. 20–21, and the ALJ did not make a finding of fact that Sharrie worked "at the
substantial gainful activity level" at any time between her original alleged onset date (March 4, 2018) and
her amended alleged onset date, *see* R. 14, 18, 22. Sharrie's record also contains conflicting evidence on
that issue. *See* R. 56–58, 61–66, 87–88, 102, 115, 271, 274, 277–83. Accordingly, I will not address the
Commissioner's alternative justifications for the ALJ's legally inadequate persuasion analysis. *Bates*,
726, F. App'x at 960 (citing *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . .
affirm the ALJ's decision only upon the reasons he gave.")); *cf. Fox v. Colvin*, 632 F. App'x 750, 755
(4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ

916 F.3d 307, 311–13 (4th Cir. 2019). Moreover, although ALJ Munday "summarized the evidence that [s]he found credible, useful, and consistent" with her conclusion that Sharrie could do light work, she "never explained how [s]he concluded—*based on this evidence*—that [Sharrie] could actually" meet those exertional demands, including "standing and walking for six hours" during an eight-hour workday, *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). In fact, ALJ Munday did not find that Sharrie could lift up to 20 pounds or stand/walk for six hours on a regular and continuing basis. She "expressed [Sharrie's] RFC in terms of exertional level of work without . . . engaging in a function-by-function analysis" of her MDI-related limitations. *Dowling*, 986 F.3d at 388 (cleaned up). Each error precludes meaningful judicial review of the ALJ's exertional RFC finding, thus requiring reversal and remand. Accordingly, I do not address Sharrie's constitutional challenge.

A.    *The Legal Framework*

A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her MDIs and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). Generally, a reviewing court will affirm the ALJ's RFC findings and conclusions when it is clear that she considered all the relevant evidence under the correct legal standards,

---

applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record.").

*see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and her written decision builds an "accurate and logical bridge from that evidence to [her] conclusion," *Woods*, 888 F.3d at 694 (cleaned up).

"Medical opinions"—i.e., "statement[s] from a medical source about what [the claimant] can still do despite" her MDIs and whether the claimant has "impairment-related limitations or restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2), can be critical to a proper RFC analysis. *See, e.g.*, *Oakes*, 70 F.4th at 212–15; *Woods*, 886 F.3d at 695. The regulations specify "how [ALJs] consider medical opinions" as part of their disability determinations and "how [ALJs] articulate" certain findings in their written decisions. 20 C.F.R. §§ 404.1520c, 416.920c (claims filed on or after March 27, 2017). First, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the claimant's record. *Id.* §§ 404.1520c(a), 416.920c(a). Instead, ALJs "will consider [all] medical opinions . . . using the factors listed in [subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.*; *see Oakes*, 70 F.4th at 212. Second, ALJs "will articulate . . . how persuasive [they] find all of the medical opinions" in the claimant's record. 20 C.F.R. §§ 404.1520c(b), 416.920c(b). These "articulation requirements" in turn instruct ALJs to "articulate how [they] considered the medical opinions from [each] medical source" on a source-by-source basis *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1). They "are not required to articulate how [they] considered each medical opinion . . . from one medical source individually." *Id.* ALJs should "articulate how [they] considered the medical opinions . . . from [each] medical source together in a single analysis using the factors listed in [subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.* These "persuasiveness" factors include: "(1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other

factors, like the physician's familiarity with the evidentiary record." *See Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(1)–(5)).

The first two factors—supportability and consistency—"are the most important factors [ALJs] consider when [they] determine how persuasive [they] find a source's medical opinions . . . to be. Therefore, [ALJs] will explain how [they] considered the supportability and consistency factors for [each] medical source's medical opinions." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Supportability and consistency are distinct legal concepts under the regulations. *Id.* §§ 404.1520c(b)(2)–(c)(2), 416.920c(b)(2)–(c)(2); *Oakes*, 70 F.4th at 212. "Supportability" requires ALJs to consider "the objective medical evidence and . . . explanations *presented by* [the] medical source . . . to support his or her [own] medical opinion(s)," 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (emphasis added). *See Oakes*, 70 F.4th at 212. "Consistency" requires ALJs to compare that source's medical opinions to "evidence *from other* medical and nonmedical sources" in the claimant's record, 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (emphasis added). *See Oakes*, 70 F.4th at 212. Thus, ALJs must explain how they considered *both* supportability *and* consistency for each source's medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). They "may, but are not required to, explain how [they] considered the [other] factors" in determining how persuasive the source's medical opinions are to the disability determination. *Id.*

As always, the ALJ's decision must build an accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical] opinion," *Oakes*, 70 F.4th at 214, is or is not "persuasive" evidence of the claimant's allegedly disabling medical condition, *see id.* at 212–13. When the court is "'left to guess' as to how the ALJ reached her evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of

her conclusions," *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (quoting

*Mascio*, 780 F.3d at 638), to ensure that "the ALJ's decision is supported as a matter of fact and

law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). ALJ Munday's decision does

not satisfy this "deferential standard of review," *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir.

2015).

B.    *Summary*

1.    *Relevant Evidence*

In December 2019, Sharrie applied for disability beginning March 4, 2018, primarily

because painful "knee and back problems" significantly limited her abilities to stand and walk.

R. 282, 306; *see also* R. 512–15, 525. Sharrie reported that she was 5'4" tall and weighed 220

pounds in December 2019. R. 281. Her medical records from that period show that her weight

was closer to 260 pounds, with a BMI over 44.0. *See* R. 419, 1084. Medical records submitted to

DDS also show that Sharrie injured her right ankle and foot in March 2019 and continued to

wear "a walking boot" as of April 2020. R. 91; *see* R. 437–49, 440, 473, 481–82. In July 2020

and February 2021, Sharrie testified that she could stand for at most 30 minutes before needing

to sit down and could walk only "very short distances," or about 10 minutes, at a time *See* R. 69,

306. She still wore a brace on her right foot for a fractured ankle. R. 64, 68, 73–74.

Sharrie saw three different orthopedic specialists, R. 425, during the relevant time: (i)

Frank Cucé, M.D., for primary osteoarthritis ("OA") of the left knee status-post arthroscopy and

prior total right knee replacement, R. 383–94, 423, 515, 525, 996, 1081, 1870, 1899, 1914, 1983,

2027–28; (ii) Mark Coggins, M.D., for lumbar degenerative disc disease ("DDD"), acquired

spondylolisthesis of the lumbosacral region, and lower back pain, R. 406–10, 416–19, 430–32,

512–15, 1140; and (iii) Crystal Dickson, M.D., for a fractured right ankle and arthritis pain in the

10

right foot, R. 399–405, 425–29, 440–44. Drs. Cucé and Coggins also followed Sharrie's weight and high BMI in the context of treating her bilateral knee impairments and lower back pain, respectively. *See, e.g.*, R. 512–13, 1087, 1913–14, 2027–30. Dr. Dickson did not record Sharrie's weight or BMI during their visits. R. 426, 442–44.

In late 2019, Dr. Cucé, Dr. Coggins, and Dr. Dickson each completed a standardized Disability Impairment Questionnaire assessing how Sharrie's medical impairments and related pain affected her abilities to perform certain work-related physical activities. *See* R. 383–95, 399–04, 406–10. Each physician tailored his or her medical opinion to the MDIs that he or she had diagnosed, evaluated, or treated. *See* R. 383–84. For example, Dr. Cucé's opinion addressed "primary OA of the left knee." R. 383; *see* R. 383–95. He opined that Sharrie "frequently" experienced arthritis pain in her left knee, which was aggravated by "prolonged standing or walking [and] certain movements." R. 384. While Dr. Cucé declined to offer a more specific opinion about the total number of hours that Sharrie could sit, stand, and/or walk during an eight-hour workday, R. 385, he did refer the reader to the "11/12/19 office note and xray" of Sharrie's left knee, R. 383, attached to his questionnaire, R. 383–94; *see* R. 1081–85 (copy). Dr. Cucé's office notes from November 12, 2019, show that Sharrie "walk[ed] with a fracture boot" on her right ankle and foot, "which [was] putting a lot of stress on her left knee." R. 388. His exam of Sharrie's left knee that day revealed "chronic swelling," joint tenderness, *id.*, "decreased range of motion, abnormal patellar mobility[,] and bony tenderness," R. 392. X-rays of her left knee showed "bone-on-bone contact of the medial compartment with loss of normal alignment with significant osteophytic spurring." R. 388; *see* R. 394.

Dr. Cucé's other exam notes repeatedly document limited range of motion, chronic swelling, joint tenderness, and/or crepitus in the left knee, R. 1870 (Nov. 2020), 1087–90 (Mar.

2020), 1092–96 (July 2020), plus some tenderness in the right knee, R. 1092. Sharrie told Dr.

Cucé that "her right knee [was] doing great following knee replacement surgery," R. 1870; *see*

*also* R. 1910, but that her left knee was very painful, *see* R. 1871, 1910. X-rays of both knees

taken in July 2020 showed "satisfactory alignment of the knee replacement without evidence of

fracture, dislocation, [or] loosening overtly" on the right, but "severe osteoarthritis with bone-on-

bone contact of the medial compartment and patellofemoral arthrosis" on the left with

"worsening varus deformity [compared to] previous films." R. 996.

Dr. Coggins's medical opinion addressed Sharrie's chronic lower back pain secondary to

"mild L3-4 and L4-5 degenerative disc space narrowing" and "a grade 2" lytic spondylolisthesis

of the lumbosacral region. R. 406 (citing R. 515). He opined that Sharrie could lift/carry up to 30

pounds at once and could sit for "5 [to] 6+" hours during an eight-hour workday, but she would

need to stand up for a few minutes at least once an hour. *See* R. 408. Sharrie could stand and/or

walk for only "1 [to] 2" hours during an eight-hour workday. *Id.* Dr. Coggins also identified

some limitations on Sharrie's manipulative capacities. R. 409.

Sharrie started seeing Dr. Coggins in April 2018 for moderate-to-severe lower back pain

that was worse with bending, "prolonged standing," and walking. R. 515, 512–13. On exam, Dr.

Coggins observed that Sharrie had normal strength and sensation, but she had no reflexes in her

knees and ankles, and she walked with "a moderate antalgic limp on the left." R. 515. She also

endorsed "severe right low back pain with lumbar extension." *Id.* Dr. Coggins encouraged

Sharrie to exercise more and lose weight. R. 513. She weighed 239 lbs. at that time. R. 514

(BMI: 41.02). Dr. Coggins saw Sharrie every six weeks during the relevant time. *See* R. 406. In

October 2019, he noted that Sharrie "appear[ed] in mild distress secondary to pain" and had "a

limp on the right side because of her fracture boot on the right foot and ankle." R. 432. She still

had no reflexes in either knee or in her left Achilles. *Id.* "Straight leg raising on the right cause[d] low back pain," but her left-sided exam was normal. *Id.* Sharrie displayed "a mild antalgic limp on the right secondary to her right foot/ankle problem" in December 2019. R. 419.

Dr. Dickson's opinion addressed Sharrie's right medial malleolus avulsion fracture, lateral ligament injury, low-grade stress injury, and "right foot pain [present] since April 2019 after dropping a vacuum on her foot." R. 399 (citing 443). She noted that Sharrie had "been in a [walking] boot since her injury," R. 399, and had been "doing physical therapy since April 2019 without any improvement," R. 401. *See* R. 415, 437, 439. Dr. Dickson opined that Sharrie could lift/carry up to 20 pounds at one time and sit for "6+" hours during an eight-hour workday. R. 402. She could stand and/or walk for three hours during an eight-hour workday and needed to elevate her right leg "[s]ix inches or less" off the ground. *Id.*

Sharrie started seeing Dr. Dickson in July 2019, about four months after injuring her right foot. *See* R. 440–44. She reported constant mild-to-moderate aching and "shock[] like pains" in her right ankle and foot that got worse with activity. R. 440. On exam, Dr. Dickson noted that Sharrie had an "antalgic" gait on the right side, was tender to palpation around the right medial malleolus, endorsed pain with range of motion, and had decreased (4/5) strength in the right lower extremity. R. 442–43. Her findings on the left-sided exam were all normal. *Id.* Dr. Dickson opined that Sharrie "ha[d] a tremendous amount of pain given her injury" and "recommend[ed] an Arizona brace as a long term solution rather than a [walking] boot." R. 443–44. She expected Sharrie to wear the brace for at least six months to decrease her pain and improve her "ability to ambulate." R. 444. Sharrie was supposed to be fitted for a custom Arizona brace in mid-August, R. 439, but she did not have insurance and the provider did not accept payment plans, R. 437. Dr. Dickson told Sharrie to keep wearing the walking boot because she could not afford the brace. R.

13

438. In November 2019, Sharrie told Dr. Dickson that she wore the walking boot to work and "her job [was] making her walk long distances." R. 425. Dr. Dickson's findings on exam that day were the same as at the prior visit. R. 427–28. She advised Sharrie to "continue PT and [to] limit her distances at work to 30 ft." R. 429. That December, Sharrie's physical therapist noted that they addressed Sharrie's "gait deviation" during one visit and that Sharrie's exhibited "significant improvement in quality with cuing" that day. R. 415.

In April 2020, Jack Hutcheson, M.D., reviewed Sharrie's medical records for DDS. *See* R. 89–96, 103–09. He noted at the outset that the medical opinions from Drs. Cucé and Dickson were "consistent and supported with evidence in [Sharrie'] file," R. 94, which documented "a history of a right ankle sprain, obesity, . . . OA of the knees (right knee replacement 2017/left knee arthroscopy 2017), lumbar DDD," and "antalgic [gait] in the past," R. 95, 107. Based on his review of the treatment notes and imaging results, R. 91, 103, Dr. Hutcheson opined that Sharrie could lift/carry up to ten pounds, stand and/or walk for a total of two hours, and sit for about six hours during a normal eight-hour workday, and occasionally push/pull with her bilateral lower extremities, R. 94–95, 106–07 (citing R. 388, 443, 515, 1087–90, 1092–96). He also concluded that a "sedentary RFC is indicated" based on Sharrie's DDD of the thoracic and lumbar spine, "severe OA" in the left knee, and "old injuries and OA" in the right foot. R. 96, 109. The state agency denied Sharrie's disability claims, however, because at age "49 years and 8 months," R. 98, 110, she was still a "younger person" under the regulations. R. 97–98, 109–110. When Sharrie turned 50 that August, she moved into the higher "person closely approaching advanced age" category. R. 114, 129.

Michael Koch, M.D., reviewed Sharrie's medical records for DDS in September 2020. *See* R. 115–27, 129–42. He opined that Sharrie could lift/carry up to 20 pounds, stand and/or

walk for about six hours, and sit for about six hours during a normal eight-hour workday, and

occasionally push/pull with her bilateral extremities. R. 123, 138. Dr. Koch based his "light

RFC," R. 125, 140, determination on the same imaging results and physical exam findings that

Dr. Hutcheson had cited to support his opinion that Sharrie's severe obesity, OA, and right ankle

injury limited her to sedentary work, *see* R. 123, 138 (citing R. 388, 443, 515, 1087–90, 1092–

96). Nonetheless, Dr. Koch opined that Sharrie was "capable of [a] light RFC at this time"

because three exams from July–September 2020 "show[ed] improvement [in] gait and strength."

R. 125, 140 (citing R. 1062, 1841, 1910).

   *2.    The ALJ's Decision*

   ALJ Munday referenced aspects of Dr. Cucé's and Dr. Coggins's treatment notes (albeit

without attribution) in her summary of the objective medical evidence created between August

2019 and "early 2021." R. 19–20 (citing R. 417, 419, 996, 1081, 1140, 1870, 1874, 1899, 1910–

11, 1914, 1983, 2027–28). She did not reference or cite Dr. Dickson's treatment notes anywhere

in her decision, but she did include a summary of Dr. Dickson's medical opinions, R. 20 (citing

R. 399–404), following a high-level discussion of the medical records, R. 19–20.

   The ALJ found "Dr. Dickson's assessment to be persuasive, generally, only where it is

consistent with the overall record showing [Sharrie] has a severe lower extremity impairment

that affects her ability to lift, carry, sit, stand or walk, as discussed above." R. 20. Dr. Dickson's

opinion is "consistent with" the ALJ's findings that Sharrie had severe right ankle bursitis and

bilateral knee osteoarthritis, R. 14, that limited Sharrie to "light" exertional work, R. 17, which

by definition requires lifting up to twenty pounds at one time and frequently lifting/carrying

objects weighing up to ten pounds. *See* R. 17, 20–21; 20 C.F.R. §§ 404.1567(b), 416.967(b). It

conflicts with the ALJ's implicit finding that Sharrie could also do a "good deal of walking or

15

standing," 20 C.F.R. §§ 404.1567(b), 416.967(b), meaning about six hours during an eight-hour

workday. *See* R. 17, 20–21. The ALJ specifically rejected Dr. Dickson's opinion that Sharrie

could stand/walk for three hours in an eight-hour workday, R. 20 (citing R. 402), because she

found that "Dr. Dickson's assessment did not contain any objective findings to support such an

extreme level of restriction," *id.*

The ALJ gave two other reasons why she found Dr. Dickson's medical opinions

"persuasive, generally." *Id.* First, "given the lack of objective findings to support any of these

[greater] restrictions, Dr. Dickson's assessment was vague and did not represent a complete

function-by-function analysis of [Sharrie's] impairments and limitations." *Id.* Second, "Dr.

Dickson's assessment did not provide any analysis regarding any of [Sharrie's] other medically

determinable impairments, including knee and spine conditions, or obesity, as discussed above."

*Id.* The ALJ did not explain why she found Dr. Dickson's opinion specifically limiting Sharrie to

three hours total standing/walking in an eight-hour workday to be "vague," *id.*, or why she

expected Sharrie's ankle/foot orthopedic specialist, R. 399, 425, to weigh in on "other" medical

problems that she had never diagnosed, evaluated, or treated. *See* 20 C.F.R. §§ 404.1520c(c)(3)–

(4), 416.920c(c)(3)–(4).

The ALJ found Dr. Coggins's medical opinion "to be persuasive, generally, for similar

reasons," except that Dr. Coggins did not provide "any objective examination support for

[certain] restrictions," including "manipulative limitations of the upper extremities." *Id.* She also

found Dr. Cucé's medical opinion "to be persuasive, generally, for similar reasons, as Dr. Cucé

indicated [Sharrie] had left knee osteoarthritis, but provide[d] no objective examination to

support restrictions involving the bilateral upper extremities. Thus, Dr. Cucé's assessment is

internally inconsistent, and does not represent a complete function-by-function analysis." *Id.*

ALJ Munday found "Dr. Koch's assessment to be persuasive, where it is consistent with the overall medical evidence of record that [Sharrie] has severe physical impairments that affect [her] ability to lift, carry, sit, stand, walk, perform certain manipulative and postural activities, and tolerate certain workplace environments, as discussed above." R. 21; *see* R. 17 (RFC finding). On the consistency factor, she noted that Dr. Koch's opinion was "consistent with his review of the record" as of September 2020 "including reports of spine and joint problems with relatively mild findings on exam, with improvement, and otherwise relatively unremarkable physical findings." *Id.* On the supportability factor, she "note[d] that other objective medical records, as discussed above, support[ed] Dr. Koch's assessment, particularly regarding the positive spine and joint findings on examination with related spine and joint diagnoses and treatment found throughout the record." *Id.*

Finally, the ALJ found Dr. Hutcheson's April 2020 assessment "to be not persuasive, for similar reasons, noting that Dr. Hutcheson found [Sharrie] to be more restricted, but the recent medical records and Dr. Koch's assessment showed improvement in [her] abilities." *Id.* She pointed to three parts of the record to support this conclusion. The first was Dr. Koch's opinion that recent medical records "indicated improvement in gait and strength since Dr. Hutcheson's assessment." *Id.* (citing R. 125, 140). Second, "other medical records since April 2020 indicated [Sharrie] reported she was doing really well after her knee replacement surgery." *Id.* (citing R. 1910). Third, "the records in December 2019 indicated improvement in [Sharrie's] ability to ambulate." *Id.* (citing R. 415). The ALJ did not cite any other medical records to support her conclusion that Dr. Hutcheson's medical opinion was "not persuasive" evidence of Sharrie's exertional limitations during the relevant time. *See id.*

C.    *Discussion*

17

The ALJ's persuasion analysis does not comply with the Commissioner's medical-opinion regulations. First, although the ALJ did articulate how persuasive she found each source's medical opinions, only her analysis of Dr. Dickson's opinions and of Dr. Koch's opinions actually "explain[s] how [she] considered the supportability and consistency factors" in determining that each physician's opinions were "persuasive, generally," R. 20, 21. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ referred to "support" and "consistency" when analyzing Dr. Cucé's medical opinions, but she did not explain how she considered either factor in determining those opinions were "persuasive, generally, for similar reasons," R. 20. She did not mention support or consistency at all when discussing Dr. Coggins's or Dr. Hutcheson's medical opinions. R. 20, 21. The ALJ's failure to explain how she considered each factor for these three medical opinions is reversible legal error. *See Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *1 (E.D. Mich. Aug. 13, 2021); *cf. Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 661 (4th Cir. 2017).

Second, the ALJ's conclusion that Dr. Dickson's "assessment did not contain any objective examination findings to support" her proposed three-hour "restriction[ on] standing and walking," R. 20, is not supported by the record. To start, the ALJ acknowledged in the preceding paragraph that Dr. Dickson's assessment contained a note that Sharrie "presented with right foot pain[ and] imaging indicating ligament injury, joint osteoarthritis, tendon tear, and stress injury" to the right ankle and foot. R. 20 (citing R. 399). Dr. Dickson cited both the X-ray showing a low grade stress injury to the right foot, mild ankle joint osteoarthritis, and a lateral ligament injury on the right (among other abnormalities), and the fact that Sharrie "ha[d] been in a [walking] boot since her [foot] injury" in April 2019. R. 399. Her exam notes consistently document that Sharrie walked with an antalgic gait on the right side, was tender to palpation around the right

ankle bone, endorsed pain with range of motion, and had decreased (4/5) strength in the right

lower extremity. R. 427–28, 442–43. In November 2019, Dr. Dickson instructed Sharrie to "limit

her distances at work to 30 ft." R. 429. The ALJ must explain how Dr. Dickson's objective exam

findings—which she did not mention in her decision—factored into the persuasiveness analysis.

*See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) ("The more relevant the objective medical

evidence and supporting explanations presented by a medical source are to support his or her

medical opinion(s), . . . the more persuasive the medical opinions . . . will be.").

Third, it is not clear which "reasons" the ALJ was referring to when she found Dr.

Coggins's, Dr. Cucé's, and Dr. Hutcheson's medical opinions to be more or less persuasive "for

similar reasons," R. 20–21, presumably meaning those she gave for Dr. Dickson's and Dr.

Koch's opinions. To the extent the ALJ intended to reject Dr. Coggins's and Dr. Hutcheson's

opinions limiting Sharrie to two hours standing/walking in an eight-hour workday, R. 94–95,

408, as well as Dr. Cucé's opinion that "prolonged standing or walking" aggravated Sharrie's

arthritis pain in the left knee, R. 384, the ALJ's vague reference to "the lack of objective findings

to support any of these restrictions," R. 20, does not suffice. *See Monroe v. Colvin*, 826 F.3d 176,

191 (4th Cir. 2016) (ALJ's conclusory statement that "the objective evidence or the claimant's

treatment history did not support the consultative examiner's findings," without specific citations

to the record, precluded meaningful review). Moreover, Dr. Cucé's and Dr. Coggins's opinions

together provided the "analysis regarding [Sharrie's] . . . knee and spine conditions" that the ALJ

found lacking from Dr. Dickson's opinion about Sharrie's right foot/ankle impairment. R. 20.

Thus, the ALJ's reliance on her analysis of Dr. Dicksons opinion does not provide a logical

reason for the ALJ to discount Dr. Cucé's and Dr. Coggins's medical opinions. *See Oakes*, 70

F.4th at 212–14.

Fourth, the ALJ cherry picked material from Sharrie's medical record to support her conclusion that Dr. Koch's opinion was mostly persuasive, whereas Dr. Hutcheson's opinion was not persuasive at all. R. 21. For example, she cited Sharrie's July 2020 report to Dr. Cucé that "she was doing really well after knee replacement with no pain" in her *right* knee, R. 21 (citing R. 1910), but did not mention Sharrie's report that her *left* knee pain continued to interfere with walking, standing, and physical activity, R. 1910–11. Dr. Cucé's exam notes from 2019–2020 repeatedly document limited range of motion, chronic swelling, joint tenderness, and/or crepitus in Sharrie's left knee. R. 388, 392, 1087–90, 1870, 1092–96. The report attached to Dr. Cucé's medical opinion showed that Sharrie "walk[ed] with a fracture boot" on her right ankle and foot, "which [was] putting a lot of stress on her left knee." R. 388 (Nov. 2019). X-rays of her left knee showed "bone-on-bone contact of the medial compartment with loss of normal alignment with significant osteophytic spurring." R. 388; *see* R. 394. The ALJ referenced this X-ray in her summary, R. 19, but she omitted Dr. Cucé observations that it showed both "bone-on-bone contact" and "significant" spurring in the left knee, R. 388.

The ALJ explained that Dr. Koch's light RFC was "consistent with his review of the record including . . . relatively *mild* findings on exam, with improvement, and otherwise relatively *unremarkable* physical findings." R. 21 (emphasis added). But Dr. Koch's own summary of the record mentions the July 2020 X-ray showing "severe osteoarthritis" of the left knee with "*bone on bone* contact of the medial compartment and patellofemoral arthrosis [and] *worsening* varus deformity" compared to the November 2019 X-rays. R. 134 (emphasis added). Dr. Hutcheson cited the November 2019 X-rays, among other consistently abnormal findings on physical exams and imaging, to support his sedentary RFC. R. 107; *see* R. 103. The only other record the ALJ cited to support her conclusion was a December 2019 physical therapy note

related to Sharrie's chronic low back pain with sciatica, lumbar DDD, right ankle fracture, muscle weakness, and "difficulty walking." R. 415. *See* R. 21 (citing R. 415). The record contains a general notation, "**Objective** Improvement: Ambulation, General **assessment**," followed by a narrative description of what Sharrie worked on in PT that day. *Id.* (emphasis in original). It states: "**Gait** deviation addressed in [treatment] today with significant improvement in quality *with cuing*. Pain is localized now to right SI joint and medial ankle primarily and mostly with walking." *Id.* (second emphasis added). The ALJ here appears to have relied on the general notation without acknowledging that Sharrie still needed "cuing" to show improvement in her gait quality. In any event, the fact that Sharrie's ambulation was noted as "improved" in one physical therapy note does not support the conclusion that she could stand/walk for about six hours in an eight-hour workday.

Finally, the ALJ's suggestion that Dr. Dickson's and Dr. Koch's medical opinions were "persuasive," but only to the extent that they matched the ALJ's own RFC findings, R. 17, 20–21, "'gets things backwards' by implying 'that ability to work is determined first and is then used to determine" a medical opinion's persuasiveness. *Cf. Mascio*, 780 F.3d at 639 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012) (claimant's symptoms). ALJs are supposed to compare each source's medical opinions to relevant "evidence from other medical and nonmedical sources in the [record]," 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2), when determining which MDI-related functional limitations should be reflected in the claimant's RFC. *Cf. Mascio*, 780 F.3d at 639 (claimant's symptoms). Here, the ALJ appears to have compared the medical opinions to Sharrie's RFC, not the other way around. *See id.*

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 17; **REVERSE** the Commissioner's final decision denying Sharrie's DIB and SSI claims; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: December 27, 2023

Joel C. Hoppe
United States Magistrate Judge

22